UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

IDEO, INC.
Plaintiff/Defendant in Counterclaim

V. C.A. No. 07-404 S

GTECH CORPORATION
Defendant/Plaintiff in Counterclaim

# GTECH CORPORATION'S MEMORANDUM IN OPPOSITION TO IDEO, INC.'S MOTION FOR PRELIMINARY INJUNCTION

## Introduction

The above-entitled case arises from an approximately two million dollar contract between Plaintiff/Defendant in Counterclaim IDEO, Inc. ("IDEO") and Defendant/Plaintiff in Counterclaim GTECH Corporation ("GTECH"), in which IDEO was retained by GTECH to redesign its Game Guard[1] product to improve to its appearance and functionality over the existing model.

Near the completion of the Game Guard redesign project, GTECH discovered that IDEO had breached the contract between the parties by failing to disclose material information regarding the cost of the redesigned Game Guard - as required by the explicit terms of the contract between the parties - and by delivering sub-standard design documentation. As a result, GTECH did not pay the last installment of the contract, and has filed a Counterclaim seeking reimbursement of four installments GTECH has already paid.

[1] The Game Guard allows a retail clerk to automatically dispense scratch-off lottery tickets, while allowing the lottery outlet to precisely track the sales of such tickets. The Game Guard has been distributed by GTECH to retailers for approximately five years. The Game Guard is now known as, and currently marketed under the trademarked name "Instant Showcase." Affidavit of Keith Howard ("Howard Aff.") at ¶4.

In an attempt to transform the prophylactic shield of a preliminary injunction into a coercive sword to force GTECH to pay the final installment, IDEO has deceptively recast this contract dispute into an "intellectual property" case, and filed the instant Motion For Preliminary Injunction, seeking to prevent GTECH from going forward with its already delayed plans to distribute the Game Guard.

However, as will be discussed below, this case is a textbook contract dispute, with adequate remedies available at law in the unlikely event IDEO prevails on its claims. IDEO's misplaced and complete reliance on "presumptions" falls woefully short of meeting the threshold requirement of demonstrable and irreparable harm required for the issuance of a preliminary injunction. Additionally, IDEO's material breaches of the contract at issue, and GTECH's substantial performance of the same, make it unlikely that IDEO ultimately will prevail on the merits.

Accordingly, IDEO's Motion should be denied.

## Relevant Facts

GTECH is a leading provider of gaming technology and services to lotteries located throughout the United States and the world. Howard Aff., ¶3. Included in GTECH's offerings are goods and services related to the distribution of instant (or "scratch-off") lottery tickets at the retail level. To this end, for approximately the past five years, GTECH has offered its lottery customers a product called the Game Guard, a machine that allows retailers to attractively display instant lottery tickets to potential customers; allows retail clerks to easily dispense the tickets; and facilitates the retailers' tracking of instant ticket sales. Howard Aff., ¶4.

***The Services Agreement and Statement of Work***

In or about January of 2006, GTECH entered a Services Agreement with IDEO to redesign the Game Guard. (Attached as Exhibit A). The Services Agreement specifically incorporated a Statement of Work ("SOW")(Attached as Exhibit B), a document outlining the parties' respective duties and obligations pertaining to the Game Guard redesign project. Howard Aff., ¶5. Under the Services Agreement and SOW, GTECH was obligated to pay at least[2] $2.1 million to IDEO in fees, plus IDEO's out-of-pocket production costs. SOW (Exhibit B) at 15. Payment of the fee was to be made pursuant to a nine-installment payment schedule, over the course of four design phases. SOW (Exhibit B) at pp. 8-14. The four phases of the Game Guard project had a completion target date of approximately one year. Howard Aff., ¶6; *see also* SOW, *Project phase details* (Exhibit B) at pp. 8-14.

Under the terms of the Services Agreement, IDEO recognized that GTECH would be the "sole owner of (i) all Deliverables[3] provided to client hereunder; (ii) all copyrights in any works of authorship fixed to said Deliverables, and (iii) inventions or discoveries conceived, created, developed under or in connection with this Agreement and which are described or embodied in one or more Deliverable, together with all intellectual property rights related to the foregoing." Services Agreement (Exhibit A), §6.1. The ownership of the Deliverables was only subject to IDEO's "right, title and interest in [IDEO's]

[2] The SOW provided for up to $400,000 in incentive bonuses for IDEO if the redesign of the Game Guard had a cost of goods and services ("COGS") below the target of $3,000 per unit. As will be discussed *infra*, IDEO did not achieve this goal, and failed to fully inform GTECH of substantial COGS over-runs.

[3] "Deliverables" is defined in the Services Agreement as "tangible takeaways provided by IDEO to [GTECH] as specified in the applicable SOW for the corresponding Phase of the Services." Services Agreement, §1.2.

Design Processes and Pre-Existing Works." Services Agreement (Exhibit A), §6.2. IDEO agreed to give GTECH a perpetual license to use any of IDEO's Design Processes and Pre-Existing Works to the extent they were embedded in any Deliverable delivered to GTECH in connection with a phase, if GTECH accepted and paid for the "corresponding phase." Services Agreement (Exhibit A), §6.3, 6.5.

In addition to setting out the project parameters and payment schedule, the SOW clearly established GTECH's priorities and requirements for the Game Guard redesign project. In this regard, the per-unit cost, or COGS, of the Game Guard was GTECH's highest concern. Howard Aff., ¶7. To this end, the SOW reads as follows:

> In all programs there are four fundamental business elements of which only ONE can be set immovable and thus anchor the program. These elements are: 1) product cost, 2) product feature set, 3) program cost and 4) schedule.
>
> **GTECH has informed IDEO that the project anchor is PRODUCT COST.**

SOW (Exhibit B) at p. 2 [bold emphasis added].

Equally clear in the SOW is GTECH's emphasis on keeping the per-unit COGS for the Game Guard at $3,000 or less. SOW (Exhibit B) at pp. 3, 5, 15. In fact, IDEO acknowledges in the SOW that COGS above $3,000 per unit has "greatly diminished value to GTECH." SOW (Exhibit B) at p. 5.

In view of GTECH's emphasis on the cost target, IDEO agreed to the following in the SOW:

> Although the project has been configured to maximize the chances of reducing COGS, [IDEO] cannot guarantee a particular COGS outcome as this involves many factors that are outside IDEO control. **If at any point it is determined the COGS target cannot be met, IDEO will promptly notify GTECH such that a decision can be made going forward.** GTECH may, at its option, terminate the Services Agreement and work being performed under this STATEMENT OF

> WORK per the terms of the IDEO Services Agreement if it is determined at any time that the COGS target cannot be met.

SOW (Exhibit B) at p. 5 [emphasis added]. Howard Aff., ¶8.

Plainly, the Agreement put a premium on the COGS being at or below $3,000, and mandated an affirmative duty to IDEO to "promptly" notify GTECH if the target could not be met.

Upon the execution of the Services Agreement and SOW, the Game Guard redesign project commenced. Although IDEO was able to perform its obligations in the initial conceptual phase, it soon became apparent that IDEO did not have the requisite experience and expertise for executing the mechanical engineering requirements. This led to problems and delays in the Game Guard project. For example, the internal drawers IDEO initially designed to hold the lottery tickets inside the Game Guard completely failed, and required redesign. Consequently, the project was significantly delayed. Howard Aff., ¶9.

In November 2006, during phase two of the project, and in accordance with the Agreement, IDEO released a "complete" design, and an updated estimate of the per unit COGS for the Game Guard.[4] At this time, IDEO informed GTECH that the unit cost of the Game Guard would be $3,270, or approximately 9% over the $3,000 target. Howard Aff., ¶10. Despite this failure to meet the specified COGS target, GTECH, after internal

---

[4] This would be the final scheduled COGS determination IDEO would provide for the Game Guard project. Howard Aff. ¶10. However, under the terms of the SOW, IDEO had a continuous and affirmative duty to report any COGS over-runs. SOW (Exhibit B) at p. 5.

deliberations, decided to waive its option to terminate the Services Agreement, and proceeded with the project.[5] Howard Aff., ¶11.

In accordance with the SOW, as IDEO achieved various milestones, GTECH issued the corresponding payment. In total, GTECH paid eight of the nine installments to IDEO, totaling $1,913,336 in fees. The final payment to IDEO by GTECH was issued on January 10, 2007. Howard Aff., ¶12.

***IDEO's Breaches***

In or about January of 2007, IDEO provided GTECH with what should have been the final design documentation package for the production of the redesigned Game Guard; specifically, documentation immediately suitable and usable for use in the manufacturing of the Game Guard. However, upon receiving the documentation, it immediately became apparent to GTECH that IDEO's mechanical documentation was profoundly sub-standard; failing to meet GTECH's expectations, and "the prevailing standard for professional consultancy firms providing similar services." Howard Aff., ¶13, Services Agreement, §2.2. In this regard, the electronic files containing design databases were of extremely poor quality and unstable, which resulted in frequent "crashes" and slow performance of GTECH's engineering computer systems. Furthermore, the documentation contained a significant amount of design errors that are still being fixed by GTECH to this day. Howard Aff., ¶13. GTECH expended great effort communicating with IDEO in an effort to address these issues. However, these efforts were largely fruitless in addressing the mechanical documentation issues. Howard Aff., ¶14.

[5] As would later be discovered, and as discussed *infra* at 7-8, the $3270 figure provided by IDEO was a gross understatement of the actual per unit COGS of the Game Guard.

In light of the significant delays in the Game Guard project, and IDEO's inability to produce usable documentation, GTECH opted to salvage the project, and mitigate its damages by devoting its own employees and resources to bringing the Game Guard redesign documentation provided by IDEO up to usable form.[6] Howard Aff., ¶15. During GTECH's overhaul of the design documentation provided by IDEO, and the related costing of the Game Guard production design, GTECH discovered that the per unit cost over-run for the Game Guard was far in excess of that reported by IDEO. Howard Aff., ¶16. This discrepancy appears to be attributable to the following circumstances.

An original premise of the SOW was that GTECH would manufacture the entire Game Guard system in its own facilities. To this end, the SOW included basic "assumptions" regarding material loads and labor costs. SOW (Exhibit B) at p. 16, *Appendix X*. One of the assumptions was that GTECH would perform all assembly work "in-house," at its own facilities. However, during late October, 2006, during the second phase of the project, and **prior** to IDEO's release of its COGS estimate of $3,270, GTECH, working with IDEO, determined that it would be less costly for an outside sheet metal vendor to provide certain preassembled parts for the Game Guard project, rather than GTECH performing this aspect of the product manufacturing and assembly. IDEO was fully aware of this decision to outsource this element of the manufacturing process. Nevertheless, the COGS estimate provided by IDEO the following month, in November

---

[6] In this regard, GTECH was required to divert approximately eleven employees from their other duties to the Game Guard project. These highly skilled and specialized employees expended approximately 1,187 hours, over the course of twelve months to correct the Game Guard documentation and design errors provided by IDEO. Howard Aff., ¶15.

2006, failed to accurately account for the outsourced components and labor. Howard Aff., ¶16.

Taking the outsourcing of the sheet metal assembly into account, the actual per unit COGS was $3,700, or more than 23% over the $3,000 target, as opposed to the 9% overrun reported by IDEO. Howard Aff., ¶17. GTECH discovered this significant discrepancy between the actual per unit COGS, and IDEO's COGS determination in approximately late May to early June 2007. At no time did IDEO ever inform GTECH that the true per unit COGS for the Game Guard would be $3,700. Howard Aff., ¶18.

In early July 2007, GTECH received an invoice from IDEO, seeking payment of the final installment under the SOW.[7] (Attached as Exhibit C). Shortly thereafter, on July 27, 2007, GTECH sent correspondence to IDEO informing it that the production documentation package did not meet the expectations and requirements of the Services Agreement and SOW, and that GTECH took issue with the failure of IDEO to have revealed the true per unit COGS overrun. Correspondence of Robert Hochstein to David Privitera, dated July 27, 2007 (Attached as Exhibit D). In October of 2007, as a result of these violations of the Services Agreement and SOW, GTECH informed IDEO that it would not pay the final invoice. GTECH further demanded IDEO return all payments

[7] In its Complaint, and in the Affidavit of David Privitera In Support Of IDEO's Motion For Preliminary Injunction ("Privitera Aff."), IDEO rests many of its arguments on its claim that it sent its final invoice to GTECH "on or about June 1, 2007." Complaint, ¶13, Privitera Aff., ¶8. IDEO suggests that GTECH's alleged lack of action after being billed should prevent it from challenging IDEO's performance.

However, the invoice in question includes an expense reimbursement accounting dated June 29, 2007. Exhibit C at p.2. Accordingly, this supports GTECH's position that it was not billed until early July 2007. GTECH notified IDEO of the deficiencies in IDEO's performance well within the contractually required thirty day period from the receipt of this invoice. Accordingly, IDEO's testimony and arguments to the contrary should be disregarded.

made by GTECH after November 2006, the time that IDEO produced the either knowingly false, or erroneous per unit COGS determination. See Correspondence of Robert Hochstein to David Privitera, dated October 5, 2007 (Attached as Exhibit E). In response, IDEO filed the instant lawsuit. GTECH has filed a Counterclaim.

At this time, in light of GTECH's important requirement to have an instant ticket vending device in its product offerings to clients, and GTECH's enormous investment in time and money in the redesign project, GTECH has begun to manufacture and distribute the Game Guard on a limited basis. The current status of the Game Guard product was outlined in correspondence from GTECH's counsel to this Court on December 19, 2007 (Attached as Exhibit F).

## Argument

As will be discussed *infra*, it is axiomatic that a movant seeking a preliminary injunction must make a threshold showing that denial of such relief would cause it irreparable harm. In the instant case, IDEO's prayer for injunctive relief rests on a completely baseless and disingenuous claim of irreparable harm, "supported" by nothing more than bald, unsubstantiated assertions that it will succeed on the merits. Accordingly, IDEO's Motion should be denied.

## I. THE LEGAL STANDARD.

In *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151 (1st Cir. 2004), the First Circuit Court of Appeals restated and outlined, as follows, the four-factor balancing test to be applied in determining whether a preliminary injunction is warranted:

> Under the accepted framework, the four elements that a district court faced with a motion for preliminary injunction must assess are the following:
>
> (1) the likelihood of success on the merits;

> (2) the potential for irreparable harm if the injunction is denied;
> (3) the balance of relevant impositions, i.e. the hardship to the movant if enjoined as contrasted with the hardship to the movant if no injunction issues; and
> (4) the effect (if any) of the court's ruling on the public interest.
>
> *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996)("*Ross-Simons I*").

*Charlesbank Equity Fund II,* 370 F.3d at 162.

Elaborating on the four-part inquiry, the *Charlesbank* Court held that a showing of "irreparable harm" was the first line of inquiry in a court's determination of a preliminary injunction motion. In this regard, the Court held:

> **In most cases. . . irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.** *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004); *accord Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000)("*Ross-Simons II*")(describing irreparable harm as "an essential prerequisite" for receiving such redress). The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant. *Ross-Simons I*, 102 F.3d at 18.

*Id.* [emphasis added].

## II. IDEO HAS COMPLETELY FAILED TO MEET ITS BURDEN OF ESTABLISHING IRREPARABLE HARM.

Because irreparable harm is a "threshold requirement" for succeeding on a motion for a preliminary injunction, IDEO's complete failure in this regard, alone, justifies denial of its Motion.

### A. <u>IDEO Has Adequate Remedies At Law</u>.

In its Memorandum, IDEO asserts, without any specifics, that it will be irreparably harmed in the absence of an injunction because (1) it would lose protection for its "trade secrets;" (2) its ability to enforce its intellectual property rights would be impaired because of revelation of its "trade secrets;" (3) denial of the injunction would

"make it impossible for IDEO to sell this intellectual property to another party;" and (4) the lack of an injunction would "make it more difficult for IDEO to enforce its IP rights[.]" Memorandum In Support Of Plaintiff's Motion For Preliminary Injunction ("IDEO's Memorandum") at 9-10. However, there is one undeniable fact that undermines IDEO's suggestions that it will suffer harm in the absence of an injunction: **GTECH is currently utilizing and distributing the redesigned Game Guard in the exact manner that it would have had it had paid the final installment under the Services Agreement.** GTECH will not, now or in the future, place any information or "trade secrets" in the public domain that would not have been in the market had it paid the final installment. Undoubtedly, had IDEO received the final payment, it would not be in this Court seeking protection for so-called "trade secrets." It is ridiculous to suggest, as IDEO does, that the mere placement of the Game Guard device in the public domain would expose IDEO's undefined "trade secret" intellectual property. If such exposure had **any** basis in fact, then why would IDEO agree to perform services (and accept more than two million dollars from GTECH) when it understood all along that the Game Guard would be placed in the public domain through GTECH's sale of the device to third party lottery retailers? Accordingly, all this case is really about, from IDEO's perspective, is obtaining the money it believes it is due.

However, "Irreparable harm most often exists where a party has **no** adequate remedy at law." *Charlesbank Equity Fund II,* 370 F.3d at 162 [emphasis added]. In the instant case, IDEO has a clear remedy at law if it is successful in its claims: it would be entitled to payment of the final installment (plus interest), and potentially double or treble

damages (under its Massachusetts 93A claim). **Courts have repeatedly held that irreparable harm cannot be established when a contract exists between the parties that clearly defines the make-whole relief (performance of the contract)**. *See e.g. Charlesbank Equity Fund II* (monetary award making movant whole provides adequate remedy at law); *Interco Incorporated v. The First National Bank of Boston*, 560 F.2d 480, 485-486 (1st Cir. 1977)(preliminary injunction denied because movant, if successful in its suit, would only be entitled to the benefit of allegedly breached letters of credit agreement); *The Foxboro Company v. Arabian American Oil Company*, 805 F.2d 34, 36 (1st Cir. 1986)(No "irreparable injury where only money is at stake and where plaintiff has satisfactory remedy at law to recover money at issue.").

Additionally, even if IDEO were successful on its 93A claim (a Massachusetts claim in Rhode Island court), and entitled to treble damages, this is an adequate remedy at law for the purpose of denying a preliminary injunction. *See Auburn News Company, Inc. v. Providence Journal Company*, 659 F.2d 273, 277 (1st Cir. 1981)(available treble damages for contract related anti-trust claim is an adequate remedy at law for purpose of denial of preliminary injunction).

Consequently, in view of the available legal remedies, IDEO's Motion should be summarily denied.

**B. <u>IDEO's Bald Claims Of Irreparable Harm Are Speculative and Unsupported</u>.**

Rather than identifying specific "trade secrets" that would purportedly be revealed in the absence of a preliminary injunction, IDEO hangs its hat on a handful of cases that it claims stand for its suggestion that, "[A]s a matter of law, courts presume irreparable harm due to GTECH's wrongful use of IDEO's intellectual property." IDEO's

Memorandum at 9, *citing Pickler Intern. Corp. v. Imaging Equipment Services, Inc.*, 931 F.Supp. 18 (D. Mass. 1995); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.* 982 F.2d 633 (1st Cir. 1992); *Concrete Machinery Company v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600 (1st Cir. 1988). However, IDEO's reliance on these cases is deceptive because in each instance, the litigants did not have a contractual relationship with clearly defined rights and remedies, and there were clear allegations of specific trademark, copyright, and patent rights infringement. *Pickler Intern. Corp.* (lawsuit against former employees accused of stealing copyrighted proprietary manuals for use in competition against company); *Societe Des Produits Nestle, S.A.* (lawsuit by trademark holder and local distributor to halt importation of "gray goods" in violation of trademark rights); *Concrete Machinery Company* (lawsuit by company against competitor alleging misappropriation and use of copyrighted designs). Plainly, IDEO recognizes it cannot identify any real harm, and instead, attempts to rely on speculation and spurious presumptions.

However, the First Circuit has made clear, "A preliminary injunction should not issue except to prevent a **real** threat of harm. . . . A threat that is either unlikely to materialize or purely theoretical will not do." *Matos*, 367 F.3d at 73, *citing Ross-Simons I*, 102 F.3d at 19 ("a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm"), 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure §2948.1, at 153-54 (2nd ed. 1995); *Pub. Serv. Co. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) [emphasis added]. **To this end, IDEO has utterly failed to identify any real threat.** This failure is the result of IDEO's inability to point to any potential harm beyond the fact that denial of

IDEO's Motion will make it unable to coerce GTECH into paying it money it does not deserve. This does not satisfy the irreparable harm requirement. Thus, IDEO's Motion should be denied.

## III. IDEO IS UNLIKELY TO PREVAIL ON THE MERITS.

Although the lack of demonstrable irreparable harm should end this Court's inquiry, IDEO's unsupported assertion that "there is no dispute" it will prevail on the merits deserves response. IDEO's Memorandum at 6.

### A. GTECH's Refusal To Pay IDEO The Final Installment Is Not A Breach Of The Services Agreement Or SOW.

IDEO's argument that it will prevail on its breach of contract claims rests on the following bald assertions: (1) the Services Agreement is valid and binding, (2) IDEO performed its duties under the contract, and (3) GTECH has not paid, and is using IDEO's intellectual property. IDEO's Memorandum at 7. However, as outlined *infra* at **pp. 6-8**, IDEO breached the Agreement with GTECH by both failing to provide work product that conformed with industry standards, and either negligently or knowingly failing to inform GTECH of a significant COGS overrun beyond the $3,270 figure actually reported by IDEO. Although IDEO is fully aware of these breaches that have been raised by GTECH, it essentially, and tellingly, ignores them in its Memorandum.

It is beyond dispute that GTECH already has paid IDEO over two million dollars under the Services Agreement. In light of this fact, IDEO's suggestion that GTECH would withhold the final $140,000 payment on whim, or as an overall accounts receivable strategy, is ludicrous. There is a legitimate controversy between GTECH and IDEO as it pertains to the Services Agreement. Accordingly, IDEO's suggestion of a "slam dunk" case should be given short shrift.

B. **<u>GTECH's Distribution Of The Game Guard Does Not Infringe On IDEO's Alleged Intellectual Property Rights</u>.**

Similar to its unsupported claims that GTECH owes it money, IDEO also falsely suggests that it "owns" the Game Guard product,[8] and GTECH's use of the Game Guard improvements is in breach of the Services Agreement. However, this assertion ignores the plain language of the Services Agreement.

As previously noted, under the terms of the Services Agreement, IDEO recognized that GTECH is the "sole owner of (i) all Deliverables provided to client hereunder; (ii) all copyrights in any works of authorship fixed to said Deliverables, and (iii) inventions or discoveries conceived, created, developed under or in connection with this Agreement and which are described or embodied in one or more Deliverable, together with all intellectual property rights related to the foregoing." Services Agreement (<u>Exhibit A</u>), §6.1. The ownership of the Deliverables was subject only to IDEO's "right, title and interest in [IDEO's] Design Processes and Pre-Existing Works," of which IDEO agreed to give GTECH a perpetual license, to the extent a license was even necessary, if GTECH accepted and paid for the "corresponding phase." Services Agreement (<u>Exhibit A</u>), §6.2, 6.3, 6.5.

In this regard, the current version of the Game Guard is comprised solely of technology and components that were part and parcel either of GTECH's pre-existing product, or improvements contained in Deliverables provided to GTECH by IDEO, for which IDEO was fully compensated. Howard Aff., ¶19. In other words, GTECH has

---

[8] At the outset, it bears noting that IDEO did not invent the Game Guard. Rather, it was retained merely to improve the functionality and design of GTECH's pre-existing product. This fact further erodes IDEO's suggestions that it should have any influence in the manner in which the Game Guard is utilized in the market.

already paid for any and all technology contained in the current Game Guard. The only claim IDEO can validly make is that it retains its "right, title and interest in [IDEO's] Design Processes and Pre-Existing Works." IDEO's Design Processes and Pre-Existing Works, to the extent that any were utilized, were contributed (and fully paid for) during the first eight stages outlined in the Services Agreement and SOW. Stage 9 Deliverables were nothing more than refinements of previously delivered Deliverables, many of which, as discussed *supra,* were of substandard quality. As outlined supra at §II(B), IDEO has yet to, and in fact cannot, identify any such proprietary elements. **In point of fact, the Game Guard does not, as a standing unit, contain any IDEO intellectual property, or pose the threat of revealing the same to its competitors.[9] Howard Aff., ¶20.**

Thus, since GTECH clearly "owns" the Game Guard, a preliminary injunction barring its distribution would be inappropriate.[10]

---

[9] The real threat of trade secret infringement confronting design consultancy firms, like IDEO, lies in revelation of the **processes** used by its professionals in developing products, rather than placement of the final product in the market (where it obviously is intended to ultimately be placed). Howard Aff., ¶21. Accordingly, the Services Agreement contains a confidentiality provision. Services Agreement (Exhibit A), §5. It is not alleged that GTECH violated this provision.

[10] Assuming merely for the sake of argument that IDEO does have some legitimate interest in "intellectual property" contained in the Game Guard, and in light of the fact that GTECH has paid approximately 94% of the full contract fees, then equitable principles of unjust enrichment, as well as the legal doctrine of substantial performance would suggest that GTECH has complete right and title to the goods and services for which it paid. *See e.g. U.S.A. Coil & Air, Inc. v. Hodess Building Co.*, 1999 R.I. Super. LEXIS 146 at 7 (Gibney, J.)("The doctrine of substantial performance, which is followed in [Rhode Island] alleviates the harshness of 'the perfect tender rule.' Under this doctrine, a party may recover under the contract notwithstanding minor defects or omissions if it would be unreasonable to condition recovery on strict performance."), *citing National Chain Co. v. Campbell*, 487 A.2d 132, 135 (R.I. 1985).

C. **<u>IDEO's Massachusetts 93A Claim Is Procedurally and Substantively Flawed.</u>**

In Count II of its <u>Complaint</u>, IDEO raises a claim of unfair and deceptive trade practices under Mass. Gen. Laws Ch. 93A. Specifically, IDEO claims that GTECH violated the statute by 1) not paying IDEO, 2) falsely accusing IDEO of breaching the contract, and 3) using IDEO's "intellectual property" in violation of the Services Agreement. IDEO <u>Complaint</u>, ¶33.0 However, this 93A allegation by IDEO should be rejected on both substantive and procedural grounds.

First, regarding procedural bars to IDEO's claims, the Services Agreement dictates that the contractual relationship between IDEO and GTECH is to be "governed by the laws of the State of Rhode Island[.] Services Agreement (<u>Exhibit A</u>), §11.2. Obviously, 93A is a uniquely Massachusetts claim. Consequently, IDEO's 93A allegation, which is grounded on claims that GTECH's alleged breaches of the Services Agreement were intentional, should be barred under the Agreement's very terms. Additionally, although the Services Agreement may have been negotiated in both Rhode Island and Massachusetts, and performance of the Agreement may also have been divided between the states, the acts alleged by IDEO as deceptive - failure to pay, wrongful use of "intellectual property," and purported false accusations - all occurred outside of Massachusetts. In such instances, when the allegedly deceptive acts primarily occurred outside the Commonwealth, this Court has indicated a 93A action does not lie in Rhode Island's federal courts exercising diversity jurisdiction. *Eastland Bank v. Massbank For Savings*, 767 F.Supp.29, 35 (D.R.I. 1991)(Lagueux, J.); *see also Boston Hides & Furs v. Sumitomo Bank*, 870 F.Supp. 1153 (D. Mass. 1994)(93A claim requires

deceptive acts occur within the Commonwealth). Thus, as this case proceeds, IDEO's 93A claim will likely be subject to dismissal or summary judgment.

Furthermore, substantively, IDEO's 93A claims are grounded on allegations that GTECH has intentionally breached the Services Agreement. As noted *supra*, it is unlikely that IDEO will be able to establish any breach of the Services Agreement by GTECH. Consequently, there can be no intentional breaches if there are no breaches in the first instance.

In conclusion, IDEO's bald assertions of likelihood on the merits, to the extent they are relevant in light of the lack of irreparable harm, are not sufficient to sustain its Motion.

## IV. THE BALANCE OF RELEVANT IMPOSITIONS ON THE PARTIES WEIGHS AGAINST IDEO'S MOTION FOR AN INJUNCTION.

The final applicable factor[11] to be weighed by this Court is "the balance of relevant imposition, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues[.]" *Charlesbank Equity Fund II,* 370 F.3d at 162. Here, the balance of hardships heavily weighs against granting IDEO's Motion.

As stated *supra*, dating back to approximately 2002, the Game Guard has been a part of GTECH's product offerings to its clients. Currently, the Game Guard is an integral element of incentive packages that GTECH is providing to its client, the New York State Lottery. There are also plans to sell the Game Guard in key markets over the coming year. *See* Exhibit F. Accordingly, the granting of IDEO's Motion will not only

---

[11] GTECH suggests that this contract dispute between two private parties does not implicate the final element of the relevant test requiring this court to consider "the effect (if any) of the court's ruling on the public interest." *Charlesbank Equity Fund II,* 370 F.3d at 162.

deprive GTECH of a pre-existing, important product in its offerings, but will also damage GTECH's relationship with its existing clients. GTECH has already suffered undue delays in the roll out of the Game Guard because of IDEO's breaches of the Agreement. Further delays in its ability to offer the Game Guard while this litigation plays out will bring further financial hardships and loss of customer good will on GTECH.

Conversely, IDEO will not suffer **any** hardship if their Motion is denied. As outlined above, distribution of the Game Guard will not expose any purported IDEO "intellectual property" that would not have been otherwise been revealed had GTECH paid IDEO in full. Quite simply, IDEO has available adequate remedies under the law if it prevails, and will not be irreparably damaged if its Motion is denied.

## Conclusion

For the foregoing reasons, and others that may be presented at a hearing of this matter, GTECH respectfully requests this Court deny IDEO's Motion For Preliminary Injunction.

Respectfully submitted,
GTECH CORPORATION
By its attorneys,

/s/ Andrew Berg

ANDREW BERG Bar No. 4754
Sammartino & Berg LLP
128 Dorrance Street
Suite 400
Providence, Rhode Island 02903
(401) 274-0113
(401) 274-0175 fax
berg@sbllp.net

**CERTIFICATION OF SERVICE**

I hereby certify that on this 4th day of January 2008, a true copy of the above Memorandum was served by electronic filing upon the following counsel of record:

Mitchell R. Edwards, Esquire
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza
Suite 1500
Providence, RI 02903

Meghan M. Hart, Esquire
Cooley Godward Kronish LLP
The Prudential Tower
800 Boylston Street
46th Floor
Boston, MA 02199

Jay B. Kesten, Esquire
Cooley Godward Kronish LLP
The Prudential Tower
800 Boylston Street
46th Floor
Boston, MA 02199

Robert B. Lovett, Esquire
Cooley Godward Kronish LLP
The Prudential Tower
800 Boylston Street
46th Floor
Boston, MA 02199

/s/ Andrew Berg