UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

IDEO, INC.
Plaintiff/Defendant in Counterclaim

V. C.A. No. 07-404 S

GTECH CORPORATION
Defendant/Plaintiff in Counterclaim

**AFFIDAVIT OF KEITH HOWARD IN SUPPORT OF GTECH CORPORATION'S OPPOSITION TO IDEO, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

I, Keith Howard, attest that the following facts are true to the best of my knowledge and belief:

1. I am currently employed by GTECH Corporation ("GTECH"). I have been with GTECH for approximately eighteen years, working in the area of product development. For approximately the past seven years, I have been a product development manager. During the course of my career at GTECH, I have worked on or managed the development of approximately thirty different GTECH products. Over the past five years, I have specialized in developing ticket dispensing devices that intergrate many components within one enclosure.

2. I worked on the Game Guard redesign project with IDEO, Inc. ("IDEO"), during which I became the manager of the project when another project manager moved to another position within GTECH. I am very familiar, and have personal knowledge, regarding the events surrounding the facts at issue in the above-entitled case between GTECH and IDEO.

3. GTECH is a leading provider of gaming technology and services to lotteries located throughout the United States and the world.

4. Included in GTECH's offerings are goods and services related to the distribution of instant (or "scratch-off") lottery tickets at the retail level. To this end, for approximately the past five years, GTECH has offered its lottery customers a product called the Game Guard, a machine that allows retailers to attractively display instant lottery tickets to potential customers; allows retail clerks to easily dispense the tickets; and facilitates the retailers' tracking of instant ticket sales. The Game Guard has been distributed by GTECH to retailers for approximately five years. The Game Guard is now known as, and currently marketed under the trademarked name "Instant Showcase."

5. In or about January of 2006, GTECH entered a Services Agreement with IDEO to redesign the Game Guard. A true copy of the Services Agreement is attached to GTECH's accompanying Memorandum as Exhibit A. The Services Agreement specifically incorporated a Statement of Work ("SOW"), a document outlining the parties' respective duties and obligations pertaining to the Game Guard redesign project. A true copy of the SOW is attached to GTECH's accompanying Memorandum as Exhibit B.

6. Under the Services Agreement and SOW, GTECH was obligated to pay at least $2.1 million to IDEO in fees, plus IDEO's out-of-pocket production costs. SOW (Exhibit B) at 15. Payment of the fee was to be made pursuant to a nine-installment payment schedule, over the course of four design phases. SOW (Exhibit B) at pp. 8-14. The four phases of the Game Guard project had a completion target date of approximately one year SOW, *Project phase details* (Exhibit B) at pp. 8-14.

7. In addition to setting out the project parameters and payment schedule, the SOW clearly established GTECH's priorities and requirements for the Game Guard redesign project. In this regard, the per-unit cost, or COGS, of the Game Guard was GTECH's highest concern. GTECH's over-riding focus was for the redesigned Game Guard to have a per unit COGS of $3,000 or less.

8. Because of GTECH's emphasis on the cost of the Game Guard, IDEO agreed in the SOW as follows: "If at any point it is determined the COGS target cannot be met, IDEO will promptly notify GTECH such that a decision can be made going forward." SOW (Exhibit B) at p. 5.

9. Upon the execution of the Services Agreement and SOW, the Game Guard redesign project commenced. Although IDEO was able to perform its obligations in the initial conceptual phase, it soon became apparent that IDEO did not have the requisite mechanical engineering experience and expertise to design a mass-produced sheet metal product. This led to problems and delays in the Game Guard project. For example, in the initial design, internal drawers IDEO designed to hold the lottery tickets inside the Game Guard completely failed, and required redesign. Consequently, the project was significantly delayed.

10. In November 2006, during phase two of the project, and in accordance with the Services Agreement, IDEO released a "complete" design, and an updated estimate of the per unit COGS for the Game Guard. This would be the final scheduled COGS determination IDEO would provide for the Game Guard project. At this time, IDEO informed GTECH that the unit cost of the Game Guard would be $3,270, or approximately 9% over the $3,000 target.

11. Despite this failure to meet the specified COGS target, GTECH, after internal deliberations, decided to waive its option to terminate the Services Agreement, and proceeded with the project.

12. In accordance with the SOW, as IDEO achieved various milestones, GTECH issued the corresponding payment. In total, GTECH paid eight of the nine installments to IDEO, totaling $1,913,336 in fees. The final payment to IDEO by GTECH was issued on January 10, 2007.

13. In or about January of 2007, IDEO provided GTECH with what should have been the final design documentation package for the production of the redesigned Game Guard; specifically, documentation immediately suitable and usable for use in the manufacturing of the Game Guard. However, upon receiving and reviewing the documentation, it immediately became apparent to GTECH that IDEO's mechanical documentation was profoundly sub-standard; failing to meet GTECH's expectations, and "the prevailing standard for professional consultancy firms providing similar services." In this regard, the electronic files containing design databases were of extremely poor quality and unstable, which resulted in frequent "crashes" and slow performance of GTECH's engineering computer systems. Furthermore, the documentation contained a significant amount of design errors that are still being fixed by GTECH to this day.

14. GTECH expended great effort communicating with IDEO in an effort to address these issues. However, these efforts were largely fruitless in addressing the mechanical documentation issues.

15. In light of the significant delays in the Game Guard project, and IDEO's inability to produce usable documentation, GTECH opted to salvage the project, and mitigate its

damages by devoting its own employees and resources to bringing the Game Guard redesign documentation provided by IDEO up to usable form. In this regard, GTECH was required to divert approximately eleven employees from their other duties to the Game Guard project. These highly skilled and specialized employees expended approximately 1,187 hours, over the course of twelve months to correct the Game Guard documentation and design errors provided by IDEO.

16. During GTECH's overhaul of the design documentation provided by IDEO, and the related costing of the Game Guard production design, GTECH discovered that the per unit cost over-run for the Game Guard was far in excess of that reported by IDEO. This discrepancy appears to be attributable to the following circumstances. An original premise of the SOW was that GTECH would manufacture the entire Game Guard system in its own facilities. To this end, the SOW included basic "assumptions" regarding material loads and labor costs. SOW (Exhibit B) at p. 16, *Appendix X*. One of the assumptions was that GTECH would perform all assembly work "in-house," at its own facilities. However, during late October, 2006, during the second phase of the project, and prior to IDEO's release of its COGS estimate of $3,270, GTECH, working with IDEO, determined that it would be less costly for an outside sheet metal vendor to provide certain preassembled parts for the Game Guard project, rather than GTECH performing this aspect of the product manufacturing and assembly. IDEO was fully aware of this decision to outsource this element of the manufacturing process. Nevertheless, the COGS estimate provided by IDEO the following month, in November 2006, failed to accurately account for the outsourced components and labor.

17. GTECH determined that when the outsourcing of the sheet metal assembly was taken into account, the actual per unit COGS was $3,700, or more than 23% over the $3,000 target, as opposed to the 9% overrun reported by IDEO.

18. GTECH discovered this significant discrepancy between the actual per unit COGS, and IDEO's COGS determination in approximately late May to early June 2007. To the best of my knowledge, at no time did IDEO ever inform GTECH that the true per unit COGS for the Game Guard would be $3,700.

19. The current version of the Game Guard is comprised solely of technology and components that were part and parcel either of GTECH's pre-existing product, or improvements contained in Deliverables provided to GTECH by IDEO, for which IDEO was fully compensated.

20. The Game Guard does not, as a standing unit, contain any IDEO intellectual property, or pose the threat of revealing the same to its competitors.

21. In my experience, the real threat of trade secret infringement confronting design consultancy firms, like IDEO, lies in revelation of the processes used by its professionals in developing products, rather than placement of the final product in the market (where it obviously is intended to ultimately be placed).

I declare, under the pains and penalties of perjury, that the foregoing information is true and correct to the best of my knowledge.

Keith Howard 1/4/08
KEITH HOWARD

## CERTIFICATION OF SERVICE

I hereby certify that on this 4th day of January 2008, a true copy of the above Affidavit was served by electronic filing upon the following counsel of record:

Mitchell R. Edwards, Esquire
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza
Suite 1500
Providence, RI 02903

Meghan M. Hart, Esquire
Cooley Godward Kronish LLP
The Prudential Tower
800 Boylston Street
46th Floor
Boston, MA 02199

Jay B. Kesten, Esquire
Cooley Godward Kronish LLP
The Prudential Tower
800 Boylston Street
46th Floor
Boston, MA 02199

Robert B. Lovett, Esquire
Cooley Godward Kronish LLP
The Prudential Tower
800 Boylston Street
46th Floor
Boston, MA 02199

/s/ Andrew Berg